IN THE

# SUPREME COURT OF JUDICATURE

OF THE

# STATE OF NEW JERSEY,

## AT FEBRUARY TERM, 1860.

JOSEPH ASHMORE and JEREMIAH LALOR *vs.* PENNSYLVANIA STEAM TOWING AND TRANSPORTATION COMPANY.

1. A person engaged in the business of towing boats is liable for damages arising from the negligence of his agent, who has charge of the towing vessels, where the parties have not agreed to the contrary.

2. The agent of a towing company made an agreement with the master of a canal boat to tow the boat from Bordentown to Schuylkill, and back again, at the risk of the master and owner, the master agreeing to keep a competent man at the helm of his boat at all times while the tow was in motion, and guaranteeing that the boat should be seaworthy and reasonably fit for the trip. *Held*, that under this agreement, if the boat to be towed was seaworthy, the only risks that the towing company were exempt from were the risks incidental to ordinary careful navigation, and they were not exempt from liability for damages caused by the negligence or unskilfulness of their agents or servants: *held also*, that an action for *tort* was the proper remedy, the contract being set out in the declaration as matter of inducement.

3. The failure of the master and owner of the canal boat to perform the

Ashmore v. Pennsylvania Steam Towing Transportation Co.

stipulations of the agreement do not affect the liability of the party towing the boat, unless such failure to perform contributed to the accident.

4. A common carrier may make a contract limiting or lessening his responsibility, but ought not to be permitted to make a contract that will exempt him from liability for damages occasioned by his own or his servants' negligence or misconduct.—Per VAN DYKE, J.

5. Whether persons engaged in towing boats are considered common carriers, and should be held responsible, as such, for the boat towed and its cargo?—*Query.*

This cause came before the court on a motion for a new trial. The facts sufficient for a proper understanding of the case appear in the opinions delivered.

Argued at June term, 1859, before the CHIEF JUSTICE, and Justices VREDENBURGH, WHELPLEY, and VAN DYKE.

*Bradley*, for the motion.

*Beasley*, contra.

WHELPLEY, J. This was an action on the case by the plaintiffs, owners of a canal boat called the Free Trader, against the defendants, proprietors of a steam tug, for negligence in towing the Free Trader on the Delaware, *per quod* she was sunk and lost.

If the defendants were liable for the consequences of an accident caused by the negligence of their agent, I think the verdict was right. It was in entire accordance with the decided weight of evidence in the case. The boat was lost because of the grounding of the steamer, and she grounded upon a known bar in the Delaware, which might have been avoided by the use of ordinary care and skill.

I do not deem it necessary at this time to decide the vexed question, whether a tower is a common carrier, so as to be subject to the common law liabilities of a carrier for hire, nor the other question, so elaborately discussed at the bar, whether a common carrier may by agreement

repeal the common law, and substitute a law made for the particular case.

The policy of permitting parties to change the law at pleasure is to my mind quite questionable. But be that as it may, it is extremely clear that a tower is liable for all damages arising directly and solely from the negligence of his agent having charge of the towing vessel, where the parties have not agreed to the contrary.

In this case the agents of the respective parties entered into an agreement in writing, which stated that the agent of the towing company had agreed to tow the canal boat Free Trader, whereof Lynch was master, from Bordentown to Schuylkill, and back again, empty, *at the risk* of the master and owner of said boat, and subject to the stipulations following : first, the said master expressly agrees to have a competent man at the helm of his said boat at all times while the tow is in motion ; second, the said master expressly guarantees that his said boat is seaworthy, and reasonably fit for the trip undertaken.

It is said, on the part of defendants, that the agreement to tow the boat at the risk of the master and owner of the boat exempts the defendants from liability to respond for a loss caused by the negligence of their agent in command of the towing vessel ; that such is the literal import of the agreement. An agreement which is to exempt a party for hire from any responsibility for his own negligence ought to be so explicit as to leave no room for doubt.

There is no presumption in favor of such a construction. We can hardly suppose the owner of a tow would willingly and knowingly enter into an agreement of that import. If the strict literal import of the first clause of the agreement be adhered to, it would cover not only the case where a loss occurred through negligence, but also wilfulness of the owner of the towing boat or his agent. But we cannot suppose such to have been the actual intent ; no person in his senses would agree that

another might wilfully destroy valuable property committed to his care without being responsible there for.

We must resort to construction to reach the legal import of the agreement. In doing this, the whole agreement must be examined, not that stipulation only which contains the words at the risk of the master and owner of said boat, but all the stipulations.

I think the broad language of the first stipulation must be limited by the actual intent of the parties, as shown by the agreement as a whole.

What is the object of the stipulations required of the master of the tow? The first requires the master to have a competent man at the helm at all times when the tow is in motion. This may be said to be a stipulation not intended to guard the tow from danger, but to render the management of the tow more easy by the tower. This may be true. The stipulation may have a double object, but I think it is fairly susceptible of the latter.

But what shall be said of the second stipulation, requiring the master to guarantee expressly that his boat is seaworthy and reasonably fit for the trip undertaken?

Its only object can be to limit the responsibility incurred by the taking of the boat to tow. If the boat be seaworthy, and fit for the trip undertaken, the risk of loss by negligence or accident caused by that will be diminished; and to diminish this risk to the smallest possible amount, the master is required to guarantee expressly the seaworthiness and fitness of his boat. If the tower is to be exempt from liability for negligence of his agent—if he is to be liable in no event—why require an express guaranty that the boat is seaworthy?

The whole agreement, taken together, obviously means that the tower is to be exempt from the risks incidental to ordinary careful navigation, but not from those caused by his own negligence or that of his agents, if the boat is seaworthy and reasonably fit for the purposes of the trip.

The case of *Wells and Tucker* v. *The Steam Navigation. Co.*, 4 *Selden* 380, is a case in principle like the one now before the court. There the contract of towage was contained in an order directing the captain of the tug to take in tow the boat at the risk of the master and owners, and collect $25. That was the whole contract, and the court held the tower responsible.

In *Caton* v. *Rumney*, 13 *Wend.* 387; *Alexander* v. *Green*, 3 *Hill* 9 ; *Wells* v. *Steam Navigation Co.*, 2 *Comstock* 204, the words of the contract were similar to those just mentioned.

The English cases cited on the argument, *Austin* v. *Manchester*, 10 *Com. Bench* 453 ; *Carr* v. *Lancashire and Yorkshire Railroad Co.*, 7 *Excheq.* 707 ; *Pardington* v. *South Wales Railroad Co.*, 1 *Hurls. & Nor.* 392 ; were all cases of explicit contracts for non-liability, where the language of the contract was too plain to admit of doubt or even debate. These cases, turning as they do upon the terms of contracts, differing *toto cœlo* from that under consideration, furnish neither authority or advice towards the settlement of this case.

It is evident that if a tower may limit his responsibility by contract, that each case must be decided mainly upon the particular contract entered into. The contract in this case was intended to exempt the tower from all risk incidental to careful navigation, and the exemption was not to extend to risks caused by want of skill or care in the tower.

It was contended that the company were not liable for the loss, because there was not, at the time the accident occurred, a competent man at the helm, according to the first stipulation. If the failure to perform this stipulation in any way contributed to the loss, this would be fatal to the plaintiff's claim ; but that question was left to the jury, and they have decided otherwise, and I think very properly. If the contract had stipulated that the master should carry at all times in his cabin extra lines for lash-

ing or anything else used about a vessel, as an anchor, the failure to comply with the stipulation would not discharge the tower, unless he, in some way, sustained damage by its nonperformance. One who sues another for negligence cannot recover if he himself has been guilty of negligence which contributed to produce the result. *Moore* v. *The Central Railroad of New Jersey*, 4 *Zab.* 268, *S. C.* 824.

If this were an action upon the contract, it would not be incumbent upon the plaintiff to allege or prove performance of this stipulation, for its performance is not made by the contract a condition precedent to the performance of any agreement to perform the towing with due and proper care. Whether covenants or stipulations are concurrent or independent, or one is a condition precedent to the other, must always depend upon the sense and substance of the contract, not its form merely or the order in which they stand. *Kingston* v. *Preston, Doug.* 690; *Pordage* v. *Cole*, 1 *Saund.* 319, *b.* 2; *Pars. on Con.* 40.

A stipulation may be in the nature of a condition precedent to some of the other stipulations, without being so as to all. If the Free Trader had presented itself to be towed without any man to stand at the helm, the tug might have refused to take her in tow, or if, after she had been taken in tow, her master had refused to keep a competent man at the helm, the tug might have cast her off, and refused to tow her any further, or it might waive the performance of the stipulation altogether. So far the stipulations might be dependent, but the nonperformance of this stipulation by the master of the tow could not justify a breach of the stipulation to tow the boat skilfully and carefully. The defendant could not say, you did not fulfil the stipulation to keep a competent man at the helm, therefore I navigated my tug carelessly and negligently, and destroyed your boat.

It was said, on the argument, that the failure to keep a competent man at the helm operated as a recission of

Q*

the implied stipulation to tow carefully and skilfully. This is but a statement of the argument just disposed of in another form. It would be so if the performance of the covenant to tow carefully and skilfully was dependent on that of the covenant to keep the man at the helm.

There remains but one objection, that the action was improperly in *tort*, and not upon the contract. The contract to tow is set out as inducement, and the legal duty resulting is set forth, and the tortious breach of the duty is averred. This mode of declaring is in accordance with the precedents.

The action against a carrier may be either in assumpsit or case. 2 *Chit. Pl.* 357, *note* 648; *Com. Dig., Action on Case C.* In all the books of entries precedents are given of declarations, both in assumpsit and case. But if this case does not fall within the law of carriers, and the declaration is deficient in form, it is amendable. The case has been tried upon its merits. Neither party has been surprised by the form of the pleadings; and the line dividing actions on the case, *ex contractu* from those *ex delicto*, is in cases of this kind so shadowy that you may pass from one to the other oftentimes without being aware of the transition.

The rule to show cause should be dismissed.

VAN DYKE, J. In April, 1857, the defendants, with their steam tug Henlopen, took in tow the defendants' boat, or scow, the Free Trader, loaded with sand, (in connection with 13 other boats) for the purpose of towing the same from Bordentown to Schuylkill and back, for the sum of $7. The fourteen boats were arranged and fastened together in three tiers of four abreast, and two abreast in the rear, the tow line being some sixty feet in length. Previous to starting, the parties, through their agents, had signed a written agreement that the voyage was undertaken at the risk of the master and owner of the boat Free Trader, the captain thereof expressly agree-

ing, in and by the said writing, "to have a competent man at the helm of said boat at all times when the tow was in motion." And he also guarantied "that the said boat was seaworthy, and reasonably fit for the trip undertaken.

When nearly opposite Rancocas creek, at about the hour of twelve or one o'clock in the morning, the steam tug suddenly struck on a bar, or other obstruction, and became fast; the tow was thrown into confusion, coming into collision with the steam tug and the boats with each other; the stem line of the plaintiffs' boat parted, or gave way. It swung around on the Pennsylvania side, and in the general jostle it was injured and sunk, and has not since been raised. The plaintiffs' boat is not shown to be unseaworthy; but it is proved and admitted that there was no person at the helm at the time of the occurrence, and had not been for some fifteen or twenty minutes, although there were persons on board. The Chief Justice charged the jury, that if the steamer was out of her course, and had struck upon a bar in consequence, and if this was occasioned by the want of ordinary care and prudence, such as a prudent person would take of his own property, the defendants would be liable for the loss notwithstanding the written agreement aforesaid.

The jury were further charged, that if the sinking of the boat was the inevitable consequence of the grounding of the steamer, and if a man at the helm could not have been of any possible service in saving the boat, then his absence from the helm at the moment of the accident could not affect the plaintiffs' right to recover. The jury found a verdict for the plaintiffs, and the question is, are they entitled to recover under the circumstances of the case?

The questions involved in this inquiry have become a little uncertain in modern times. By the common law, common carriers, or persons whose business it was to carry or transport the goods and property of other persons

from one place to another for hire, were held to a very rigid accountability, amounting to an absolute insurance, and were only excusable when the loss occurred through the acts of God and the public enemy. In more recent times, and especially since the introduction of steam as a means of transportation, there has been a constant effort on the part of carriers to shake off this responsibility, by means of notices, advertisements, tickets, special contracts, and the like, while the courts in the mean time, as a general thing, have yielded a very reluctant aid to such efforts, in a number of cases refusing to sustain them at all, even when there was a special contract. So strictly was the old law adhered to in England, that parliament interfered, and passed several acts, especially that of 17 W. 4, and 1st Victoria 6, authorizing common carriers to make special contracts with the persons who employed them, as to how the risks of transportation were to be borne. I am not aware of the passage of any such act in this country, but there has been nevertheless, in some of the states of the Union, a continued modification of the laws concerning common carriers, and the whole subject has become so diversified and intermixed with contradictory decisions that it is not easy to determine with certainty what the law is in relation to such matters.

The principal defence in this case is, that here was a special contract between the parties, by which the plaintiffs agreed to incur all the risk of such a loss as occurred; and the first question which seems to present itself is, can common carriers lawfully make a special contract changing their liability from that which was imposed on them by the common law? I can see no reason why they may not, under proper circumstances, make contracts with their employees not contrary to public policy, by which their liability may be regulated, lessened, or limited. The reasons why common carriers were held to such a stringent accountability doubtless were not merely because they carried for hire, but because they usually took

the exclusive custody and control of the articles carried to the exclusion of the owner, and because the toleration of any excuse, except for such loss as no human effort could by possibility prevent, might lead to collusion with others to deprive the owner of his property, and at the same time exempt the carrier from responsibility; but just to the extent to which the owner retains the custody of or control over the property carried he ought to be responsible, and the carrier ought to be exempt, and there can be no reason why there should not be a special agreement on that subject: and although there has been considerable discussion on the question whether *any* contract could lawfully be made limiting the liability of a common carrier, yet the question seems to be now fully settled that such contracts can be lawfully made, and I shall assume such to be the law without reference to any of the numerous authorities by which it is sustained.

But a much more important, as well as much more difficult question, is the *extent* to which a common carrier may, by a special contract, exempt himself from liability.     This question has given rise to much discussion, to various *dicta*, and a number of decisions, upon the whole not very harmonious, so far from being so in fact as to leave the law on the subject far from being settled.     Under the English statutes authorizing special contracts, the English courts, in 70 *Com. Law Rep.* 454, 7 *Excheq.* 707, and 89 *Com. Law* 621, go very far towards sustaining a carrier in exempting himself by contract from all losses arising from what could be termed negligence; but the contracts in those cases were very comprehensive, very circumstantial, very explicit, and related to the carrying of live stock on railways, and the decisions turned much more on the meaning of the contracts on the points under particular consideration than in the enunciation of any new principle.

In 3 *Hill* 1, it was held that a tow boat was *not* a common carrier, and that under a special contract placing the

risk on the plaintiffs, the owners of the tow boat were not responsible for the sinking of the tow, even though it occurred from want of ordinary care on their part; but this decision was reversed by the Court of Appeals, in 7 *Hill* 533, by a vote of 17 to 1.

In 2 *Comstock* 204, the Supreme Court had held that a steam tug or tow boat *was* a common carrier, and liable as such, and could not exempt itself from such liability by a contract that the plaintiff was to take the risk. The Court of Appeals reversed this decision, and held that the defendants could make a contract for exemption, and ordered a new trial.

In 4 *Selden* 375, the Court of Appeals held the defendants liable for gross negligence, notwithstanding a special contract placing the risk upon the plaintiff.

In 1 *Smith* 444, the court held a railroad company liable for gross negligence or want of skill for injury done to a passenger, although the passenger paid no fare, and was riding under a special agreement that the company was to be exempt from all liability. And in 26 *Barbour* 641, the court held that a railroad company would not be liable under such circumstances, except for fraud or gross misconduct or negligence, which seems very much like the same thing.

In 23 *Penn.* 526, the court held that public carriers cannot exempt themselves from gross negligence, even by contract.

In 6 *Indiana Rep.* 416, the court held tow boats responsible for gross negligence, such as going too fast, even when under a special contract that the risk is to be with the owner of the tow.

In 1 *American Railway Cases* 171, the Supreme Court of Maine, holds that an express agreement exempting the company from all loss cannot protect it against its own negligence or misconduct. In 2 *American Railroad Cases* 357, the same doctrine is announced, and in another case in the same volume, p. 399, it is held that notice that all

baggage is at the risk of the owners, though brought home to the plaintiff, cannot excuse the company.

The subject, in different forms, has been at different times before the Supreme Court of the United States. The case bearing most directly on the point now under consideration was one which attracted considerable attention at the time, in consequence of the very serious disaster out of which it proceeded, the burning of the Lexington on Long Island sound in January 1840. It was very elaborately argued, and very ably examined and discussed by different members of the court, in announcing their decision. It is found reported in 6 *Howard* 344. The suit was brought to recover for specie alleged to have been lost with the loss of the boat. The principal defence was that the specie was carried under a special contract between the parties, which in its terms exempted the defendants from all loss whatever. Harnden, well known as an express man, had a contract with the company, by which, in consideration of $250 per month, they agreed to carry for him, on board their steamers, a wooden crate of certain dimensions, contents unknown, once on each day, between New York and Providence, and it was expressly stipulated that "the said crate, with its contents, is to be at all times exclusively at the risk of the said William F. Harnden ; and the New Jersey Steam Navigation Company (the defendant) will not in any event be responsible, either to him or his employers, for the loss of any goods, wares, merchandise, money, notes, bills, evidences of debt, or property of any and every description, to be conveyed or transported by him in said crate or otherwise in any manner in the boats of the said com pany." Into the crate thus bargained for the specie in question was placed by Harnden, and the crate and its contents seem to have been at all times under the control of him or his agents, except that the company transported it from one place to the other in their boats, without even a knowledge of its contents. Notwithstanding this very

express agreement, which was in due form reduced to writing, the court held the defendants liable for the loss, on the ground of negligence and want of due caution and care.

While, therefore, it seems to be very well established that special contracts may be made between the parties, the great weight of authority seems to be, that carriers cannot be permitted to make contracts by which to shelter and protect themselves in courts of law against their own clear and palpable wrongs, either of omission or of commission. They may contract for exemption against such accidents as common prudence could not foresee or guard against, and when no actual fault can be ascribed to them; but it has been repeatedly held contrary to public policy to sustain a contract by which a carrier might be tempted into dishonesty or a relaxation of his faithfulness and duty. It seems to be conceded that he cannot contract against his own fraud; but fraud is but one of the forms of wrong of which a carrier may be guilty, and against which he cannot lawfully contract; but it is no more repugnant to the law than any other mode by which the owner of property, confiding it to the care and custody of others to be carried, is cheated, swindled, or otherwise deprived of it by the clear wrong, fault, or misconduct of the carrier, and it matters but little to the owner whether the loss occurs by the one mode or the other. Gross negligence is held to be presumptive evidence of fraud, and the omission to exercise proper skill, when skill is presumed and required, is considered gross negligence. 1 *H. Black.* 158.

The rule to be drawn from the great preponderance of authority, the one which is demanded by public policy, and which is sustained by correct legal principle, is this, that a carrier, taking the exclusive custody and control of the property of another to transport from one place to another for hire, should be allowed to make no contract by which he can justify himself in or defend himself

against his own clear positive wrong, default, or misconduct, whether it arise from his own wilfulness, recklessness, incapacity, want of skill, or the failure to exact it. If the loss arise in part or in whole from the conduct of the owner, this is always a defense, and always has been, whether there is a special contract or not; but if it in fact arise from the failure to exercise an ordinary and reasonable amount of care or skill, and the exercise of which, by the carrier, would have prevented the loss, it should fall upon him, and no contract should protect him against it.

It is the more necessary, perhaps, that the law should be so at a time when the carrying business has become so greatly concentrated in the hands of heavy capitalists and powerful companies as to drive off almost all other competitors, and to compel the owners of property to submit unconditionally to the terms of transportation which they impose, or leave their goods uncarried.

But it is urged, in this case, that the defendants are not common carriers, and not subject to the liabilities incident to that class of persons. I am aware of some conflicting decisions on this question, but they seem to me to be all mere arbitrary decisions, without having any reasons given for them on the one side or the other.

The defendants certainly call themselves a transportation company. They hold themselves out to the public as such, and daily pursue that business for hire; and if they carry goods or property on board their boats, as well as at the stern, they are certainly, to that extent at least, common carriers. Steamboats carrying property from one place to another for hire are certainly common carriers, if that is their business. And if the defendants in this case are not, aside from their contract, to be held responsible by the laws which apply to common carriers, it is because they did not take the exclusive possession or control of the plaintiffs' property, but that some part of the custody and control of the boat in tow remained with the plain-

tiffs or their agents.  Aside from this consideration, I can see no reason why the defendants are not common carriers, nor do I think it at all necessary to decide the question whether they are or not.  It is much more important to ascertain precisely what the responsibilities are which they assumed than it is to ascertain the name by which we shall call them.

How far, then, had the defendants the absolute control and management of the plaintiffs' boat, to their exclusion ? If the sand boat had been carried on the deck of the steamer the control and management of it by the defendants would have been absolute.  If it had been lashed firmly to the steamer's side by the defendants, as in their opinion the best mode of conveyance, so that one or more hands on board of her could have had no power to guide or change or restrain her, or in any way to alter her position, the custody and control of the defendants would have been equally absolute.  If the defendants placed her in company with fourteen other boats, and so fastened them together, in tiers or otherwise, as that persons on board her could have had no power to guide or change or restrain her, or in way to change her position, but she depended entirely on the steamer for her course and direction, she was to all intents and purposes in the absolute control and management of the defendants, notwithstanding the tow was placed at the stern of the steam tug, and notwithstanding a nominal helmsman was to be kept aboard the sunken boat    This last position is the one in which it seems to me she was placed, and so placed by the defendants; and I do not see how it could have been supposed by the parties that the helmsman was to take any independent action in guiding or governing the boat, except to obey an order from the steamer, which should apply to all the boats alike ; and this could only be as an agent of the defendants, rather than an independent action in behalf of the plaintiffs. .

If, indeed, there had been but a single boat with a long

tow-line, so that the helmsman could have kept her in the track of the steamer, or have guided her to the right or to the left of her, the case might have been wholly different. But the plaintiffs in such case might have been wholly in fault; but such was not the fact.

I think, therefore, that the defendants were public carriers or transporters for hire. I think that, for a price fixed by themselves, they undertook to transport the plaintiffs' boat and cargo from Bordentown to Schuylkill; that for that purpose they took the entire custody, control, and management of her, and must be responsible for her loss, unless they have some exemption by which they are to be freed from it. They claim such exemption. They insist that, by the terms of the contract before referred to, the plaintiffs were to take the risk of such losses as this; and this raises the question, by whose fault or misconduct did the loss occur? If it was the fault of the plaintiffs, then the defendants are not liable. If it was the fault or misconduct of the defendants or their agents, then they are liable. There can be no supposition that the occurrence would have happened if the steamer had not struck. Whose fault was it that she did strike? Certainly it could not have been the plaintiffs'; it must have been the defendants'. Fault or great negligence there must have been. It was a case where skill was presumed and required, and if unskilful or incompetent persons were put in charge of the steamer, it was gross wrong and gross negligence, amounting to a fraud upon the owners of the property. If the necessary skill existed, and was not exercised when the exercise of it would have prevented the loss, it was also gross negligence and gross wrong; nor is it possible to doubt that if the necessary skill had been present, and had been properly exercised and exerted, the accident would not have occurred. There was nothing in the wind nor the weather, nor the water, nor in anything else, to overcome ordinary care and skill, if they had been exerted on the part of the defendants; and whether we call it fraud or misconduct, or slight negligence or gross negli-

gence, the loss arose from the clear and unquestionable
fault of the defendants; and against such faults no contract,
however explicit or however drawn, should be permitted to
protect them.

But what is the true purport and effect of the contract
before us? The defendants agreed to tow the plaintiffs'
boat and cargo from Bordentown to Schuylkill at the
*risk* of the owners. What risks could the parties have
contemplated when entering into this contract? Did the
plaintiffs mean to say, by that contract, that if their cap-
tain, through oppressive drowsiness, should happen to get
asleep, and the pilot, from inability to resist temptation,
should unfortunately get drunk, and run the tow upon the
rocks, the risk is ours, and we are to sustain the loss?
Did the defendants so understand it? And if the accident
had occurred in that way, would or could this contract
have sheltered the defendants? I can hardly think so;
and yet I am somewhat at a loss to see why it would not,
if the defendants' construction of the contract is the right
one, for I am unable to see much legal difference between
a vessel run upon the rocks by officers drunk and asleep,
and the same thing done, without any cause for it by offi-
cers sober and awake.

But it seems to me that the contract itself, taken alto-
gether, clearly shows that the parties, at the time of mak-
ing it, could not, either of them, have contemplated the
construction now contended for; for if the plaintiffs were
to take all the risks, and the defendants none, why were
the plaintiffs required to stipulate that the boat was sea-
worthy? If the plaintiffs were to take all the risks, and
the defendants none, why were the plaintiffs required to
stipulate to keep a person at the helm at all times when
the tow was in motion? These are agreements for the
benefit of the defendants, and were required by them as
aids in enabling them to make a safe voyage. But why
should the defendants have hedged themselves about with
such securities against loss, if they were not to be liable

under any circumstances? And why were the plaintiffs called upon by the defendants to enter into such stipulations, if they were only intended for their own security, and not at all for the benefit of the defendants? And on what principle is it that the company is now defending themselves on the ground that the stipulation to keep a person at the helm was violated, unless that stipulation was made for their benefit?

I think, therefore, that the contract was a proper and legal one, rightly understood. That it was intended to exempt the company from a class or set of accidents, for which they would be liable as common carriers, but are such as ordinary care and prudence cannot foresee nor prevent, but was never intended to permit them to take advantage of or justify their own wrong, or to shelter them against their own frauds, faults, misconduct, incapacity, or clear negligence or carelessness of any kind—for all these they still remain responsible ; and to meet this responsibility with as little difficulty and risk as possible, they require the plaintiffs to stipulate something on their part—and if they have failed to comply with these stipulations by reason of which the loss occurred, they cannot now recover.

The plaintiffs stipulated that their boat was seaworthy, and I do not find any evidence that shows that it was not— on the contrary, the evidence shows that she was.

They also stipulated to keep a competent man at the helm at all times while the tow was in motion. This they certainly did not do " *at all times*," for there was no one at the helm at the moment of the accident, and had not been for some fifteen or twenty minutes ; and if the construction of the words at all times is to be so strict as to mean that *any* absence from the helm while the tow was in motion amount to a violation of such stipulation, then there can be no recovery here. But I cannot suppose this—I cannot suppose that it extends to every absence at any time during the voyage, but to such absence

R*

as occasioned or contributed to the disaster; and if I could see how a person at the helm at the time the steamer struck could by possibility have prevented the loss, I should hold the plaintiffs responsible for it; but I cannot so see. What could he have done? It does not appear that he was at liberty to undertake to steer his single boat alone, or do anything else without orders from the steamer; and it seems very clear that he could not have done so if he had made the effort. No orders came from the steamer for him to obey—the men on the tow were not aware that she had struck till they felt the collision. He could not have prevented the parting of the stern line, nor the collision of the boats, nor their swinging around the steamer. All the use he could have made of the helm, had he been at it all the while, would have been to steer, or attempt to steer the boat. This, it seems to me, must have been perfectly futile. But this question was submitted to the jury by the Chief Justice, in a charge which the defendants have no reason to complain of. They have found under that charge and under the evidence that the loss of the plaintiffs' boat was the inevitable result of the striking or grounding of the steamer, and that nothing which could have been done by a man at the helm could possibly have prevented it.

I think, therefore, that the charge of the Chief Justice, as to the law of the case, was correct, and I can find nothing in the facts to justify the setting aside of this verdict.

GREEN, C. J., concurred.

VREDENBURGH, J. (dissenting). It appears by the case that, on the 28th of April, 1857, the defendants contracted with the plaintiffs to tow their canal boat, the Free Trader, on the river Delaware, from Bordentown to Schuylkill, and back, at the risk of the master and owners of said boat, and subject to the following stipulations: 1st, the plaintiffs expressly agreed to keep a competent man at the

helm of the said boat at all times while the tow is in motion; and 2d, the plaintiffs expressly guarantee that their said boat is seaworthy, and reasonably fit for the trip undertaken.

It further appears by the case that, in going down the Delaware, the tug struck on a permanent sand-bar, and the canal boat coming, in consequence, in collision with some other boat in the tow, was so injured that she sunk, and was a total loss. It further appeared that at the time of the grounding of the tug, and at the time of the collision, and while the tow was in motion, there was no person whatever at the helm of the canal boat.

It was contended, on the argument, by the plaintiffs that the defendants were common carriers, and therefore could not limit their liability by special contract.

I think, both upon principle and authority, that they were not common carriers, and consequently had a right to make this contract.

It was contended, in the second place, that the master of the canal boat had no authority to make a special contract that the towing should be at the risk of the owners. But if this be so, then there was no contract at all, express or implied, and the plaintiffs were in the condition that their captain had lashed the boat to the tug without authority, and if he got swamped, had nobody to blame but himself.

It was contended by the plaintiffs, in the third place, that by the true construction of this special contract, the defendants were bound to ordinary care  In this I think the plaintiffs were right, and that such is the true construction of the contract; and even if this were not so, I think that they would be liable in the case of gross negligence, and that the evidence would justify the jury in concluding that such was the case here.  That the jury could justly and legally infer that the vessel grounded by being run upon a permanent and well known sand-bar, and that such is gross negligence.

But I do not think any of these considerations are material to the present controversy; because, even supposing the defendants to have been common carriers, they had the right, upon well settled principles in relation to common carriers, to prescribe that a competent man should be at the helm whenever the tow was in motion, as much so as that common carriers should prescribe that they would not carry wheat flour or produce loose in the hold in the vicinity of the fires. This provision in the contract, that there should always be a man at the helm, was one which the defendants had clearly a right to prescribe, even if they were common carriers.

The sole question, therefore, material to the present controversy is as to the true construction of this contract in this regard, it clearly appearing by the evidence that when the collision occurred there was no person at the helm.

The agreement to tow is subject to the plaintiffs having a competent man at the helm of said boat at all times while the tow is in motion. The moment the man leaves the helm the contract to tow is suspended. When there is no man at the helm there is no contract to tow. They commence, they co-exist, and they terminate together. When the man leaves the helm, the tug may leave ordinary care. Here, at the instant of collision, each had abandoned his contract, one the care and the other the helm. Suppose the steamer had been injured while aground, and he could have shown that if there had been a man at the helm it might have been avoided, could not the plaintiff have said it was occasioned as much by your carelessness as ours? The plain answer is, when the accident happened both parties had abandoned their contract, the defendants their implied contract to use ordinary care, and the plaintiffs their express contract to have a man at the helm.

The contract was not that a jury might ascertain

whether if the plaintiffs had performed their contract the accident would not have happened. That was not the intention of the parties.

The jury in this case have found that if there had been a man at the helm the accident would nevertheless have happened. How could any jury intelligently say that. The boats in tow at the instant the steamer grounded were some distance in the rear? The slightest touch of the rudder instantly affects their motion, and would have induced a collision of a kind different from that which actually did happen. A blow in any other form, or at any other spot, might have produced an entirely opposite result. How could the jury say, from the evidence, it might not have been so? There were several other boats in tow; so far as appears the only one lost was the one which had no man at the helm. But it is enough to say that the parties saw fit to put themselves upon express contract, and not upon what the jury might conclude, which could be at best but a guess upon the subject.

My opinion is, that the accident having happened at-a time when both parties had suspended their contract, that the defendants are not liable.

CITED *in Ohio, &c., R. R.,* v. *Selby,* 47 *Ind.* 485; *Brown* v. *Clegg,* 63 *Pa. St.* 58; *Railroad Co.* v. *Lockwood,* 17 *Wall* 367.